UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIANE RODRIGUES
DOS SANTOS ARGUETA,

         Petitioner,

                               Civil Case No. 22-12840
   v.                             Honorable Linda V. Parker

OMAR ARGUETA-UGALDE,

         Respondent.

_____/

## OPINION AND ORDER GRANTING PETITION FOR RETURN OF CHILD PURSUANT TO THE HAGUE CONVENTION (ECF NO. 1)

This is an international child abduction case brought under the Hague Convention ("Convention") and its implementing statutes, the International Child Abduction Remedies Act ("ICARA"). 22 U.S.C.A. § 9001 *et seq*. Petitioner alleges that on November 6, 2022, Respondent wrongfully retained their shared minor child M.A. ("M.A.") and her two children from a previous marriage in the United States of America.[1] (ECF No. 1 ¶ 5, Pg ID 3.) On November 22, 2022, Petitioner filed the instant Petition for immediate return of her three children

---

[1] As outlined in Respondent's Answer, Respondent concedes he is not the biological nor legal father of the two children from Petitioner's previous marriage, and thus does not contest their return to Brazil. Therefore, the instant action only pertains to the minor child M.A. (ECF No. 8 ¶ 2, Pg ID 91.)

pursuant to the Hague Convention, as well as an Ex Parte Motion to expedite the hearing.  (ECF Nos. 1 and 6.)  Given the expedited nature of these proceedings, the Court held a status conference on December 16, 2022, during which an evidentiary hearing was scheduled for January 4, 2023, and Petitioner agreed to withdraw her Ex Parte Motion.  (ECF No. 9.)

Beginning on January 4, 2023, the Court held a three-day evidentiary hearing.  Petitioner testified from Brazil with the aid of an interpreter.  At the close of the evidentiary hearing, the parties were instructed to provide supplemental materials to the Court by January 16, 2023.  These supplemental materials included a stipulated set of facts, a stipulated chronology of the whereabouts of the family members for the relevant time period, an index of exhibits, trial briefs outlining the evidence that was submitted at the hearing, and the parties' proposed findings of fact and conclusions of law.  Both parties submitted their respective documents on January 16, 2023.  (ECF Nos. 13-21.)

Having reviewed the record and the testimony of the witnesses, the Court finds that Petitioner has demonstrated a prime facie case for wrongful retention under the Hague Convention, and therefore grants the Petition.

## I.    BACKGROUND

### a. Brazil to China

Petitioner Williane Rodrigues Dos Santos Argueta is a Brazilian citizen. (ECF No. 19 ¶ 1, Pg ID 435.)  Respondent Omar Argueta-Ugalde is a Mexican citizen.  (*Id*. at ¶ 3.)  Respondent began working and living in Brazil on a temporary work visa in 2015.  (*Id*. at ¶ 9.)  The parties began a romantic relationship and were married on August 17, 2018.  (ECF No. 19 ¶ 10, Pg ID 435.) In August of 2018, M.A. was born.  Hrg. Tr. Day I, 52: 17-2.  She is a dual citizen of Mexico and Brazil, and can speak Portuguese, Spanish, and English, though Portuguese is her first language.  Hrg. Tr. Day II, 16: 11.  M.A. also has two older siblings on her mother's side that were born in Brazil.  (ECF No. 20 at Pg ID 441.)

Importantly, Respondent maintains it was always his intention to relocate permanently to the United States after the completion of his work assignment in Brazil.  Hrg. Tr. Day I, 47: 20-23.  Petitioner concedes she was willing to travel for four years with Respondent for his work assignments while M.A. was young, but maintains their long-term plan was always to end up in Brazil.[2]  Hrg. Tr. Day II, 11: 1-5.  Regardless, the parties purchased real property in Brazil in either 2018 or

---

[2] Importantly, neither Petitioner nor Respondent have applied for permanent residency in the United States, but Respondent has also never applied for permanent residency in Brazil.  Respondent did indicate he will be applying for permanent residency in the United States in March 2023 per his company's policy, and that he began conversations with his employer pertaining to this in May of 2022.  Hrg. Tr. Day III, 149: 15-25; *Id*. 150: 1-25; *Id*. 151: 1-15.  He also testified he had conversations with Petitioner about this in March of 2022, and that she was in agreement.  *Id*. 149: 23-25.

2019, which was used as a family home until at least June 2019.  Hrg. Tr. Day I,
25: 19-25.

On June 4, 2019, the parties traveled with all three children to China for
Respondent's work assignment.  (ECF No. 8-1 ¶ 8, Pg ID 104.)  Respondent
testified that the position in China was supposed to begin on June 1, 2019, and end
on May 31, 2022.  Hrg. Tr. Day I, 20: 1-6.  He asserts that even though he was
reassigned to China, the plan remained that the family would relocate to the United
States at the end of that contract.  *Id*. 49: 6-25; Hrg. Tr. Day I, 50: 23-25; *Id*., 51: 1-
7.  Again, Petitioner concedes she was willing to follow Respondent for four years
to "visit some countries," but that the plan was always to return to Brazil.  Hrg. Tr.
Day II, 11: 1-5.  Notably, the parties did not sell their family home before the move
to China, and instead kept it as a rental property.  Hrg. Tr. Day I, 26: 6-23.  The
parties did however, ship much of their furniture to both China and Mexico.  Hrg.
Tr. Day III, 116: 12-25.

While in China, M.A. celebrated her first birthday, and she attended
international academies from morning until early afternoon each day.  Hrg. Tr. Day
I, 51: 1-25.  Respondent maintains the minor child was placed in these academies
so that she could learn English in preparation for their eventual move to the United
States.  *Id*., 49: 21-25; *Id*., 50: 1-5.  However, on January 31, 2020, Petitioner and

the three children traveled back to Brazil, though the parties dispute the reason for this departure. (ECF No. 17 at Pg ID 430.)

### b. China to Brazil

Respondent asserts Petitioner and the children left due to the Covid-19 pandemic and associated restrictions in China. Hrg. Tr. Day I, 143: 15-21. Petitioner asserts she and the children departed due to marital issues. Hrg. Tr. Day II, 13: 1-7. Petitioner further testified that she first broached the topic of divorce in December of 2019. *Id*., 11: 24-25. However, she did not file for divorce upon her return to Brazil, alleging she wanted to give Respondent a second chance. *Id*., 13: 3-7. Regardless, Petitioner and the children remained in Brazil until September 20, 2020. (ECF No. 17 at Pg ID 430.) While there, M.A. celebrated her second birthday, and attended various family events. Hrg. Tr. Day II, 16: 23-24; *Id*., 58: 3-4. During this period, Petitioner and the children lived in a rental property, as they had tenants in their family home at the time. Hrg. Tr. Day I, 151: 2-9.

### c. Brazil to China

On September 20, 2020, Petitioner and the children returned to China. (ECF No. 17 at Pg ID 430.) Petitioner asserts that the reason for the family's return to China was because the parties agreed to work on their marital issues. Hrg. Tr. Day II, 14: 1-4. Respondent disputes this, stating it was always the intent of the parties to reunite in China when the restrictions loosened. Hrg. Tr. Day I, 141: 7-16. In

an admitted attempt to attack Petitioner's credibility, Respondent introduced

evidence of Petitioner's alleged affairs around the time she and the children

returned to China.  Hrg. Tr. Day III, 18: 8-25.  Regardless, the parties remained in

China until June 20, 2021, after which Petitioner and the children returned to

Brazil.  (ECF No. 17 at Pg ID 430.)

### d.  China to Brazil

When asked why Petitioner returned to Brazil at this time, Respondent

asserted it was so that Petitioner could complete some paperwork related to the

pharmacy businesses she opened during her first trip back to Brazil from China in

2020.  Hrg. Tr. Day I, 28: 5-13.  Respondent further admitted he provided the

initial investment to his wife for these businesses, but maintained he was not

involved with the operation of them, nor did he have access to the income

generated from them.  *Id*., 29: 14-23.  Respondent later testified that Petitioner

subsequently opened a construction and real estate business in Brazil as well, but

also denied involvement in both.  *Id*., 42: 3-6; *Id*., 45: 13-14.

During this second trip to Brazil, M.A. celebrated her third birthday and saw

many of her family members on a weekly basis.  Hrg. Tr. Day II, 64: 17-20; *Id*.,

62: 12-25; *Id*., 63: 1-23.  During this stay, Petitioner and the children also lived in

another home that the parties purchased, because the pandemic made it hard for

them to find a rental in their preferred area.  Hrg. Tr. Day I, 151: 2-15.  On

November 28, 2021, the parties and children reunited in Mexico.  (ECF No. 17 at

Pg ID 430.)

### e. Brazil to Mexico

Petitioner asserts the trip to Mexico was supposed to be a holiday with

Respondent's family, after which the family would spend one year in the United

States, beginning in January of 2022.  Hrg. Tr. Day II, 23: 18-25.  However, as

time went on, Petitioner asserts Respondent informed her the visa process for the

United States was taking longer than expected, and they would need to remain in

Mexico for an extended period.  Hrg. Tr. Day III, 136: 18-25; *Id*., 137: 1-8.

Petitioner asserts she mentioned wanting a divorce while in Mexico, and

Respondent does not dispute this.  Hrg. Tr. Day II, 73: 15-18.  While in Mexico,

the family lived with Respondent's parents.  Hrg. Tr. Day I, 171: 11-14.

On January 24, 2022, Petitioner returned to Brazil, while all three children

remained in Mexico with Respondent.  (ECF No. 17 at Pg ID 430.)  Petitioner

testified that she wanted to take M.A. with her, but Respondent would not allow it.

Hrg. Tr. Day II, 36: 6-10.  Respondent testified it was his understanding that

Petitioner needed to go to Brazil to overlook her businesses.  Hrg. Tr. Day I, 152:

22-25; *Id*., 153: 1-13.  Petitioner returned to Mexico the first week of May 2022,

after which she again travelled alone to Argentina from June 8, 2022, to July 2,

2022.  (ECF No. 17 at Pg ID 430.)

Petitioner arrived back in Mexico on July 2, 2022, where the parties remained together as a family until July 31, 2022.  While in Mexico, Respondent asserts the children attended school and visited with his family.  Hrg. Tr. Day II, 137: 9-20.  Importantly, Petitioner testified that while she was in Mexico, M.A. would video chat with her extended family and maternal grandmother in Brazil numerous times a week.  *Id.*, 66: 10-4.  Respondent's testimony does not dispute this.  Hrg. Tr. Day I, 173: 18-25.

### f.  Mexico to United States

On July 31, 2022, the parties and the children departed for the United States. (ECF No. 17 at Pg ID 431.)  Petitioner asserts her understanding was still that the parties would return to Brazil in January of 2023, despite their arrival to the United States being delayed until July of 2022.  Hrg. Tr. Day II, 33: 11-15.  In support, Petitioner introduced testimony from Laudenor Desouza, her ex-husband and the father of her elder two children.  Mr. Desouza testified that it was his understanding that the family would be returning to Brazil in January of 2023, as he would never—as it pertains to the elder two children at least—consent to their relocation for longer than that.  *Id.*, 28: 25; *Id.*, 29: 1-2.  He further testified that it was his understanding when the family moved to China, that their plan was to stay for three to four years, and then return to Brazil.  *Id.*, 29: 8-12.

Once in the United States, the family lived in a rental home for roughly one month. *Id*., 47: 23-25; *Id*., 28: 1-3.  For the latter half of September, they stayed in a hotel, and it was not until the end of September that the family moved into a more permanent home.  *Id.*  While in the United States, all three children were enrolled in school, where Respondent asserts M.A. has made meaningful connections.  Hrg. Tr. Day I, 168: 11-25.  In support, Respondent called a friend of M.A.'s mother to testify, Rocio Conchos.  Mrs. Conchos testified that M.A. and her daughter are very close and attend parties and playdates together.  Hrg. Tr. Day III, 45: 1-25; *Id*., 46: 9-13.  Moreover, Respondent testified that M.A. has been visited three times by her paternal grandmother.  Hrg. Tr. Day I, 171: 15-25.  Respondent also testified that M.A. was in contact with Petitioner's family at minimum three times per week while in the United States, and daily with her paternal grandmother.  *Id*., 173: 18-25; *Id*., 74: 3-11.

On August 24, 2022, Petitioner flew to Brazil alone, and returned to Michigan on September 16, 2022.  (ECF No. 19 ¶ 31, Pg ID 435.)  The parties dispute what happened next.  Petitioner asserts that when she arrived at the airport on September 16, 2022, her phone was turned off, her credit cards were locked, and Respondent refused to pick her up.  (ECF No. 1 at Pg ID 5.)  She testified that she communicated with him through the airport wireless internet, and it was only at the behest of her elder children that Petitioner asserts Respondent agreed to

retrieve her from the airport.  (ECF No. 1-1 ¶ 17, Pg ID 13.)  Respondent disputes

this characterization of the events.  (ECF No. 8 at Pg ID 95.)

Once home, Petitioner asserts Respondent became emotionally abusive,

attended events with M.A. without her knowledge, and essentially tried to hide the

fact that M.A. had a mother.  Hrg. Tr. Day II, 90: 4-12.  Respondent again,

disputes this characterization of the events.  Nevertheless, on November 3, 2022,

Petitioner asserts she was served with divorce papers that Respondent filed in

Michigan in which he was seeking sole legal and physical custody of M.A.  *Id*., 91:

11-18.  Petitioner maintains this was a shock to her, as they had agreed to remain

in Michigan as a family until January 2023, with divorce to be reconvened at a

later time for the benefit of Respondent's image and M.A..[3]  *Id*.; Hrg. Tr. Day III,

84: 3-23.  Respondent maintains it was due to the realization of Petitioner's affairs

that he filed for divorce.  (ECF No. 8 at Pg ID 96.)

On November 6, 2022, Petitioner returned to Brazil because she felt she had

no support in Michigan, especially given the fact she does not speak English.

(ECF No. 1-1 ¶ 23, Pg ID 14.)  She asserts she requested all three children's

---

[3] Petitioner testified that Respondent was aware of her "affair" because they were
actually separated before the trip to Mexico, and that—being she is his third
wife—she remained married to him in title so he could keep up appearances with
his family.  Hrg. Tr. Day II, 72: 20-25; *Id*., 73: 1-12.  Respondent disputes this,
asserting he did not know about the "affairs" until August or September of 2022.
Hrg. Tr. Day I, 154: 2-21.

passports before departing, which she alleges Respondent refused to provide. (*Id*. ¶ 19, Pg ID 13.) Accordingly, she flew home alone. Respondent maintains Petitioner flew home of her own accord without notice and without the children. (ECF No. 8 ¶ 2, Pg ID 102.) Thereafter, on November 17, 2022, Petitioner requested by text message that the children be sent to Brazil by November 20, 2022. (ECF No. 1 at Pg ID 6.) The children were not returned by this date, but arrangements were made for the elder two children to be returned. (*Id*.); (ECF No. 8 ¶ 2, Pg ID 91.) M.A. still resides in the United States with Respondent. Accordingly, on November 18, 2022, Petitioner initiated the Hague process in Brazil. (ECF No. 1 at Pg ID 6.) Thereafter, on November 22, 2022, Petitioner filed the instant Petition, and Respondent was served on December 1, 2022. (ECF No. 1)

## II.   LEGAL STANDARD

Both the United States and Brazil are signatories to the Hague Convention, which seeks ". . . to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . ." Hague Convention, Preamble. The Hague Convention mandates that this Court determine the merits of

the retention[4] claim, but not the merits of the underlying custody claim.  *See Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir. 1993).  "If the petitioning party shows that the Hague Convention requires return to the abducted-from nation, the child is returned there to determine custody...."  *Douglas v. Douglas*, No. 21-1335, 2021 WL 4286555, at *4 (6th Cir. Sept. 21, 2021), *cert. denied,* 142 S. Ct. 1443 (2022) (internal citations omitted).  Plainly, "[i]t is the Convention's core premise that the interests of children . . . in matters relating to their custody[,] are best served when custody decisions are made in the child's country of habitual residence."  *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (internal quotations omitted).

Under the ICARA, Petitioner has the burden of showing by a preponderance of the evidence that the retention was wrongful.  22 U.S.C. § 9003(e)(1)(A).  Under Article 3 of the Convention, the retention of a child is considered to be wrongful where:

> a) It is in breach of the rights of custody attributed to a person, an institution, or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the retention; and

---

[4] The language in the Convention encompasses both wrongful removal and wrongful retention.  For purposes of this Opinion and Order, the Court will only be including retention in its citations to the Convention, as that is what is being alleged here.

      b) At the time of retention, those rights were actually
         exercised, either jointly or alone, or would have been
         so exercised but for the retention.

Accordingly, a prima facie case of wrongful retention has three elements: (1)

prior to the retention, the child was habitually resident in a foreign country; (2) the

retention was in breach of custody rights under the foreign country's law; and (3)

the Petitioner was exercising custody rights at the time of the retention. *See*

*Jimenez Blancarte v. Ponce Santamaria*, No. 19-13189, 2020 WL 38932, at *2

(E.D. Mich. Jan. 3, 2020). If a petitioner meets their burden, a court shall order

return of the child to their home country unless a respondent can show one of five

enumerated affirmative defenses.[5] *Id*.

## III.  ANALYSIS

As an initial matter, the Court finds it necessary to weigh the credibility of

the parties. Ultimately, the Court cannot find either party fully credible or

persuasive, especially given the "substantial and looming backdrop of the parties'

troubled marriage—now in dissolution—that gives each party substantial motive to

recall events and circumstances in a light that serves the litigation position of that

---

[5] Respondent briefly states in his Answer that " . . . the parties intended and agreed to reside permanently in the United States. In other words, Petitioner had consented to relocating to and living in the United States." (ECF No. 8 ¶ 4, Pg ID 102.) The consent defense requires the retaining parent to prove by a preponderance of the evidence that the petitioning party consented to the retention. 22 U.S.C. § 9003(e)(2)(B). Respondent has not satisfied this burden. The Court will not opine as to the other affirmative defenses, as Respondent does not assert any.

party." *Tsimhoni v. Eibschitz-Tsimhoni*, No. 10-10308, 2010 WL 11541986, at *2 (E.D. Mich. Mar. 26, 2010). However, after weighing roughly three full days of witness testimony, in combination with the evidence presented at the hearing, the Court finds Petitioner's testimony to be more credible.

### i.   HABITUAL RESIDENCE

A child's habitual residence depends on the totality of the circumstances specific to each case, not on categorical requirements such as an actual agreement between the two parents. *See Monasky,* 140 S. Ct. at 723. Wherever the child is at home at the time of removal or retention, is the child's habitual residence. *See id*. at 726. A child's residence in another country only becomes "habitual" when it is more than transitory, and there is some degree of integration in a social and family environment. *Id*. "Accordingly, the Sixth Circuit instructs courts to focus on the child, rather than the parents, and examine past experience, not future intentions. Only a change in geography and the passage of time may establish a new habitual residence." *Tsimhoni v. Eibschitz-Tsimhoni*, No. 10-10308, 2010 WL 11541986, at *5 (E.D. Mich. Mar. 26, 2010) (quoting *Friedrich v. Friedrich (Friedrich I)*, 983 F.2d 1396, 1401 (6th Cir. 1993)).

Furthermore,

> [t]his fact-driven inquiry must be sensitive to the unique
> circumstances of the case and informed by common
> sense. For older children capable of acclimating to their
> surroundings, courts have long recognized, facts

> indicating acclimatization will be highly relevant.
> Because children, especially those too young or
> otherwise unable to acclimate, depend on their parents as
> caregivers, the intentions and circumstances of
> caregiving parents are relevant considerations. No single
> fact, however, is dispositive across all cases.

*Monasky*, 140 S. Ct. at 727.

The facts of this case are complex given how much the parties and M.A. have travelled over the course of her lifetime.[6] To address this type of scenario, the Sixth Circuit in *Robert v. Tesson* employed a comparative analysis approach. 507 F.3d 981 (6th Cir. 2007). To elaborate, the Sixth Circuit compared the children's perceptions of and experiences in both France and the United States because the parties alternated living between the two for extended periods of time. *Id*. As such, the Sixth Circuit found it necessary to compare the children's connections to *both* nations to determine their habitual residence.

The Sixth Circuit departed from this type of analysis in *Jenkins v. Jenkins*, because in that case, the child only moved from Israel to the United States. 569 F.3d 549, 557 n.6 (6th Cir. 2009). According to the Court's reasoning, that scenario did not present the "thorny factual" circumstances present in *Robert,* and thus did not find procedural error in the district court's analysis, when it failed to consider Israel completely. *Id*.

---

[6] Notably, neither party asserts that China or Mexico are the child's habitual residence.

The Court finds the facts of this case to be more similar to the facts of *Robert* given how much M.A. has moved in her lifetime, and thus will apply the comparative analysis approach in determining her habitual residence. In applying this type of analysis, the Court concludes that up until M.A.'s departure to the United States from Mexico on July 31, 2022, her habitual residence was Brazil. The Court finds this for many reasons.

First, M.A. spent roughly half of her life in Brazil by that point. She celebrated her second and third birthday there, attended numerous family events, and was in constant communication with her large extended family, who all lived very close by. Second, M.A. was also in constant communication with her family in Brazil while in China. As both parties testified, she spoke with her family there at minimum three times per week. Moreover, she returned to Brazil *twice* from China. Regardless of whether Petitioner and the children returned to Brazil because of the pandemic or marital issues, the fact remains that M.A. returned to Brazil; her home.[7] Finally, while the child attended school in Mexico, the parties

---

[7] Respondent states that Petitioner is not being truthful in her assertion that she and the children left China in January of 2020 because of marital issues. In support, he attaches an email he sent to the international school M.A. was attending in China, which states she is withdrawing from the program because of the pandemic restrictions in China. While this is indeed plausible, it is not wholly determinative, as the Court would not expect either party to email the details of their marital issues to their child's school as justification for her withdrawal.

do not testify, nor does the Court find, that Mexico was anything more than transitory in nature. The family lived with the paternal grandparents while there, but M.A. was still in constant communication with her family in Brazil. Plainly, in a situation such as this, the Court is compelled to focus on what has been a constant in M.A.'s life. In the midst of all of M.A.'s relocations, Brazil remained the only constant.

Our analysis does not end there, as *Monasky* instructs the Court to evaluate both the child's acclimation and shared parental intent when evaluating the habitual residence of a young child. *Monasky*, 140 S. Ct. at 727. Incorporating the latter into our analysis yields the same result. First, during the relevant period of M.A.'s life, the parties kept their family home in Brazil, albeit as a rental property for at least a portion of their time abroad. The parties also purchased a second home in Brazil. Further, Petitioner maintained her businesses in Brazil while abroad, which were partially funded by Respondent. Regardless of whether Respondent was involved with them or not, he was aware that Petitioner was starting and maintaining businesses in Brazil during the course of their time abroad. This lends to the notion that the parties intended Brazil to be the family home.

Accordingly, the remaining question is whether or not M.A.'s habitual residence changed from Brazil to the United States when she departed from

Mexico on July 31, 2022.  *See Robert v. Tesson*, 507 F.3d 981, 997 (6th Cir. 2007).

In order to properly determine the habitual residence of a child in wrongful

retention cases, courts must first determine the *date* of the retention, and then

determine if this retention was wrongful depending on the habitual residence

analysis outcome.  "Determining the date of wrongful retention is difficult because

retention, rather than removal, cannot easily be reduced to a discrete moment in

time."  *Lopez Moreno v. Zank*, 456 F. Supp. 3d 904, 908 (W.D. Mich. 2020).

Courts in our Circuit have applied two tests:

> 1. The date which the child remains with the abducting
>    parent despite the clearly communicated desire of the
>    left-behind parent to have the child returned; or
> 2. When the acts of the abducting parent are so
>    unequivocal that the left-behind parent knows or
>    should know, that the child will not be returned.

*Lopez Moreno v. Zank*, 456 F. Supp. 3d 904, 908 (W.D. Mich. 2020).  Petitioner

asserts three possible retention dates:

1. November 3, 2022, when she was served with the divorce pleadings which

   indicated Respondent was seeking sole legal and physical custody of M.A.;

2. November 20, 2022, when she communicated with Respondent through a

   text message demanding he return M.A. to Brazil; or

3. December 1, 2022, the date Respondent was served with the Hague Petition

   she filed with this Court.  (ECF No. 20 at Pg ID 450-451.)

Though there is evidence to suggest Petitioner no longer consented to M.A.'s presence in the United States before December 1, 2022, in applying the first test, Petitioner's consent is unequivocally revoked as of the date of service of the instant Hague Petition to Respondent. As such, the Court finds—for purposes of a habitual residence analysis—the date of retention to be December 1, 2022.[8]

This makes the relevant length of M.A.'s life in the United States four months. Admittedly, some evidence points to a conclusion that M.A. did acquire a new habitual residence in the United States. She began school and developed meaningful connections with her classmates. She was also visited three times by her paternal grandmother, but more importantly, she was able to spend quality time with her father. However, these facts are not sufficient to overcome the overwhelming evidence suggesting Brazil remained M.A.'s habitual residence under both the acclimation and shared parental intent standard.

Regarding acclimation, M.A. video called her family in Brazil at minimum three times per week. This is material for a child, especially one that has relocated

---

[8] Respondent argued at the evidentiary hearing that if there was a wrongful retention, it can be no sooner than January of 2023 because the parties had an agreement to remain in the United States until at least then. However, because the Court has determined that Brazil was M.A.'s habitual residence up until July 31, 2022, a retention date is required to determine if M.A.'s habitual residence changed. Applying the relevant tests, it is clear that by December 1, 2022, Respondent was on notice Petitioner no longer consented to M.A.'s presence in the United States. This is a necessary fact to determining if the retention was wrongful or not.

so many times in her life.  As the Court previously mentioned, given the

uniqueness of the facts of this case, the Court is compelled to consider what has

been a constant in M.A.'s life, that being Brazil.  Moreover, given M.A.'s previous

experiences moving to various countries, there is no evidence of more meaningful

experiences in the United States than there were in China or Mexico, which the

Court already established are not the habitual residence of the child.  It is possible

that M.A. established somewhat of a settled purpose in all three countries,

however, given how strong and continuous her ties have been with Brazil, the

Court finds that M.A.'s four months in the United States were not sufficient to

acclimate her such that her habitual residence changed.  This is especially true

given she has spent less time in the United States than she did while in China and

Mexico.  Be it through her repeated physical presence in Brazil or her connection

with her family and community there while abroad, the Court finds that per M.A.'s

perception, her habitual residence is Brazil.

Regarding the shared parental intent standard, the Court finds that the

parties' last shared intent was to relocate to Brazil in January of 2023.  This is

again evidenced by Petitioner's businesses—which were partially funded by

Respondent—remaining operational during her time abroad.  Even though

Respondent asserts Petitioner's trips abroad were also to partake in extramarital

affairs unknown to him at the time, he at the very least was aware Petitioner was

maintaining her businesses in Brazil.  And this presumably, was for when the
family ultimately returned.[9]

The Tenth Circuit in *Watts v. Watts* addressed a similar situation to the facts
of this case.  935 F.3d 1138 (10th Cir. 2019).  In that case, the family moved to
Australia for the limited and short-term purpose of obtaining affordable medical
care for their sick child.  *Id*. at 1141.  The parties anticipated the move would be
for approximately two years.  *Id*.  Importantly, they maintained a home, their
businesses, and financial ties to the United States.  *Id*. at 1145.  When the marriage
ultimately dissolved, the respondent removed the children to the United States after
eleven months of them being in Australia.  *Id*. at 1142.   Because the parties last
shared intent was to reside in Australia, the petitioner asserted the respondent's
removal of the children to the United States was in violation of his rights under the
Convention.  *Id*. at 1145.  However, the Tenth Circuit noted that " . . . a court must
consider all the facts and circumstances concerning the couple's intended stay in
the country," in affirming the district court's decision that the children's habitual
residence was the United States.  *Id.*  Like the Tenth Circuit in *Watts*, the Court

---

[9] "The district court credited Helen's testimony on this point, finding that she 'never
intended for her or the Children to move back to Germany.' It noted that her
testimony was corroborated by the evidence of her continued investment in her
business and the family's life in Florida, explaining that she would not have needed
to continue pursuing an E-2 visa if she was planning to close the business." *Grau
v. Grau*, 780 F. App'x 787, 794 (11th Cir. 2019).

finds that in evaluating the totality of the circumstances, it is clear that the parties last shared intent was for M.A. to reside in Brazil in January of 2023. Even though the parties intended to stay in the United States for at least one year, this fact alone does not necessarily establish habitual residence. *Id*.

Moreover, the Court finds the parties' past and consistent behavior of travelling with all three children compelling. M.A. has made the numerous moves in her lifetime with her two siblings, and there is nothing to suggest the parties would stray from this trend in January of 2023, by keeping M.A. in the United States after her siblings returned to Brazil. This is supported by Petitioner's ex-spouse's testimony that it was always his understanding the parties would be returning to Brazil. Finally, the parties still owned their family home in Brazil, and possibly a second.

### ii.    WRONGFUL RETENTION

As previously mentioned, Article 3 of the Convention considers the retention of a child wrongful when it is in breach of the rights of custody attributed to a person either jointly or alone under the law of the state in which the child was habitually resident immediately before the retention. Article 3, Hague Convention. Under Article 1.634 of the Brazilian Civil Code, each parent, regardless of marital status, has the right to participate in the determination of their child's permanent residence. (ECF No. 20 at Pg ID 445); *Filho v. de Albuquerque*, No. 1:20-CV-

01421-RBJ, 2020 WL 9455201, at *9 (D. Colo. Aug. 21, 2020). Thus, Petitioner has the right to permit or deny a change to M.A.'s change in residence, which a family court in Brazil will ultimately assess. As a reminder, the Court is not diminishing Respondent's parental rights to the child in making this determination. It is merely deciding who has jurisdiction over the custody dispute.

### iii.    EXERCISING RIGHTS

Though Respondent does raise the issue of Petitioner's absences during 2022 as relevant for purposes of M.A.'s acclimation to life in Michigan, he does not contest the claim that Petitioner was exercising custody rights as contemplated by the Convention. (ECF No. 13 at Pg ID 123 n. 3.) The Court agrees. "Although the Hague Convention does not define exercise, our court has held that a person cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Panteleris v. Panteleris*, 601 F. App'x 345, 348 (6th Cir. 2015). This is clearly not the case here.

## IV.    CONCLUSION

"These cases are always heart-wrenching, and there is inevitably one party who is crushed by the outcome. [The Court] cannot alleviate the parties' emotional trauma, but at a minimum [the Court] can hope to provide them and their children with a prompt resolution so that they can escape legal limbo." *In re A.L.C.*, 607 F. App'x 658, 663 (9th Cir. 2015) (internal quotations omitted).

Accordingly,

**IT IS ORDERED**, that pursuant to Article 12 of the Convention, M.A. be returned to Brazil.

**IT IS FURTHER ORDERED** that Petitioner shall submit any motion for costs and fees, accompanied by a final list of incurred expenses within twenty-one (21) days after entry of final judgment. *See* U.S.C. § 9007(b)(3). Any response shall be supported by applicable authority and filed, if at all, within fourteen (14) days of Petitioner's motion.

**SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: February 2, 2023