UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIANE RODRIGUES
DOS SANTOS ARGUETA,

        Plaintiff,

                                  Civil Case No. 22-12840
v.                          Honorable Linda V. Parker

OMAR ARGUETA-UGALDE,

        Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO STAY (ECF NO. 26) AND FINDING MOOT PETITIONER'S MOTION TO ENFORCE JUDGMENT (ECF NO. 28)

On February 2, 2023, this Court issued an Opinion and Order granting Petitioner Williane Rodrigues Dos Santos' ("Petitioner") petition for return of her child pursuant to the Hague Convention ("the Act") and the International Child Abduction Remedies Act ("ICARA"). (ECF No. 22.) The Opinion ordered Respondent Omar Argueta-Ugalde ("Respondent") to return the parties' minor child M.A. to Brazil. (*Id*. at Pg ID 481.) On February 6, 2023, Respondent filed a notice of appeal to the Sixth Circuit Court of Appeals. (ECF No. 24.) Presently before the Court is Respondent's motion to stay the Court's Order to return the minor child M.A. to Brazil pending the ongoing appeal. (ECF No. 26.) Also before the Court is Petitioner's motion to enforce the Court's judgment and order

the return of the minor child M.A. to Brazil. (ECF No. 28.) Both motions were filed on February 7, 2023. For the reasons stated hereafter, the Court denies Respondent's motion to stay, thus mooting Petitioner's motion to enforce.

## APPLICABLE LAW

The Supreme Court advised in *Chafin v. Chafin* that courts should apply the four traditional stay factors in considering whether to stay an order requiring the return of a child in ICARA cases:

> i. Whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
> ii. Whether the applicant will be irreparably injured absent a stay;
> iii. Whether issuance of the stay will substantially injure the other parties interested in the proceeding; and
> iv. Where the public interest lies.

568 U.S. 165, 179, 133 S. Ct. 1017, 1027, 185 L. Ed. 2d 1 (2013). The Court will evaluate each factor in turn.

## ANALYSIS

**i.   Likelihood of Success on the Merits**

Respondent posits that he is likely to succeed on three issues: (i) whether Brazil is M.A.'s country of habitual residence; (ii) whether Respondent's retention of M.A. was wrongful; and (iii) whether Respondent proved by preponderance of the evidence that Petitioner consented to M.A.'s residence in Michigan. (ECF No. 26 at Pg ID 488.) To meet the strong showing standard " . . . requires more than a mere possibility that relief will be granted." *Nken v. Holder*, 556 U.S. 418, 129 S.

Ct. 1749, 1753, 173 L. Ed. 2d 550 (2009). Though the Court acknowledges this case is certainly unique—given how much the minor child has moved during the relevant time period—in evaluating the totality of the circumstances, the Court does not find that there is a high likelihood of success on appeal.

Beginning with the Court's habitual residence analysis, Respondent maintains first that the Court should have considered the facts of this case under the acclimation standard as articulated by *Robert v. Tesson*, 507 F.3d 981 (6th Cir. 2007). (ECF No. 26 at Pg ID 489.) In so arguing, Respondent contends the Court erroneously employed the shared parental intent standard, and even if properly employed, erroneously applied it. (*Id*. at Pg ID 491.)

As this Court stated in its February 2, 2023 Opinion, the Supreme Court in *Monasky v. Taglieri* instructs courts to evaluate the totality of the circumstances when analyzing a child's habitual residence.[1] *See* 140 S. Ct. 719, 730 (2020). Given how young M.A. was for the relevant time period, the Court found it appropriate to employ both the acclimation and shared parental intent standard, which is consistent with *Monasky*.

---

[1] "*Monasky* did not overturn all of the relevant precedent regarding the factors courts should consider in determining a child's habitual residence . . ." *Tsuruta v. Tsuruta*, No. 4:22-CV-00425-SPM, 2022 WL 4598675, at *2 (E.D. Mo. Sept. 30, 2022).

In evaluating the acclimation standard, the Court acknowledged there was certainly evidence pointing to the fact M.A. had a degree of settled purpose in the United States. However, Respondent cannot ignore the evidence to the contrary. M.A. lived in three different locations in Michigan during the period relevant to this Court's analysis. This does not support a finding that the child would have felt a degree of settled purpose in the United States. Moreover, by that point in time, M.A. was used to moving around the globe fairly regularly, and there is nothing to suggest her experience in the United States was any more meaningful to her than her experiences in China or Mexico. Bearing her repeated relocations in mind, the Court found it necessary to evaluate what has been the *only* constant in M.A.'s life, that being, Brazil.

Finally, M.A. turned four years old in the middle of August, making her extremely young for the relevant time period. This supports the Court's inclusion of a shared parental intent analysis per *Monasky*.[2] 140 S. Ct. at 727. As

---

[2] The Supreme Court concluded the following:

> "Because locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." *Redmond*, 724 F.3d at 744. For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the

Respondent points out, in applying this standard the Court must determine " . . . the parents' last 'settled mutual intent' for where their child would live." *Ahmed v. Ahmed*, 867 F.3d 682, 687 (6th Cir. 2017). As the Court noted in its February 2, 2023 Opinion, " . . . a court must consider all the facts and circumstances concerning the couple's intended stay in the country." *Watts v. Watts*, 935 F.3d 1138, 1145 (10th Cir. 2019). In so doing, the Court determined the parents last settled mutual intent was that M.A. would reside in Brazil.

In *Neumann v. Neumann*, the district court held that despite the children potentially being aware that their time in Mexico would come to an end, that did not diminish the roughly four consecutive years of day-to-day life they had experienced there. *See* 197 F. Supp. 3d 977, 981 (E.D. Mich. 2016). This is distinguishable from the case before the Court today. First, the children in *Neumann* spent four consecutive years in Mexico, whereas M.A. has spent four years travelling the world. Second, in *Neumann*, the father's contract was renewed once—and may have been again—during their stay in Mexico, thus lending to the indefiniteness of their plans to move back to the United States. *Id.* In the case

---

intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases."

*Monasky*, 140 S. Ct. at 727.

before the Court today, there was ample evidence lending to the fact the parties' last settled mutual intent was for M.A. to live in Brazil. This evidence included Petitioner's businesses in Brazil, the testimony from her ex-husband that it was always his understanding they would be returning as a family in January of 2023,[3] and the properties the parties owned in Brazil.

The Court at this juncture also finds it important to highlight that at the close of the evidentiary hearing, it determined Petitioner's testimony to be more credible.[4] The Court found this for a number of reasons, including but not limited to, Respondent's testimony that he was not aware of Petitioner's alleged extramarital affair, when there was compelling evidence to the contrary.

To elaborate, a large part of the evidentiary hearing was devoted to testifying about Petitioner's alleged extramarital affairs. During the relevant period, Petitioner asserted the parties were separated, had an agreement to remain married for a number of reasons, and that Respondent was aware of her relationship with another man. Respondent maintained he was unaware of Petitioner's "extramarital" affairs and thus filed for divorce immediately upon finding out.

---

[3] The Court also indicated in its February 2, 2023, Opinion that the parties' pattern of keeping the three children together throughout their numerous relocations was a compelling indication that M.A. would be returning to Brazil with her siblings as well in January of 2023.

[4] While the Court was trying to avoid fleshing out the personal details of the parties' separation in its February 2, 2023 Order, it feels compelled to discuss here so as to provide context to its credibility determination.

However, on the third day of the hearing, Petitioner presented what appeared to be a text message from Respondent to her then boyfriend, on November 12, 2021. Hrg. Tr. Day III, 177: 1-10. Respondent translated the message on the record, and it read:

> I love [Petitioner], and I will always love her. I love her too much, and I will – and I want her to be happy. She deserves to be happy. My family still does not know about changes. And I am sorry for being using these photographs on my profile, but I still have some people – some people in my family, they don't know. I will let you rest. God bless you.

*Id.* After translating the message, Respondent testified he did not recognize the exchange. *Id.* Below the message, however, was a voice note—which Respondent admitted was his voice—that said:

> Good afternoon, this is [Respondent], how are you Bueno?[5] I'm here knowing about [Petitioner], and I ask you to listen to her and be patient, please. So I know what's going on between the two of you, but be patient, please, and listen to her.

*Id.* at 178: 25. Respondent maintains the messages were pertaining to Petitioner and her boyfriend's then professional relationship and that there were messages deleted in between that would have provided more context. *Id.* at 179-182. Plainly, the Court was not convinced this was the case.

---

[5] This is the name of Petitioner's then and current boyfriend.

Bearing all of this in mind, the Court concluded Petitioner showed by a preponderance of the evidence that Brazil was M.A.'s habitual residence. In so holding, it was wrongful for Respondent to attempt to change M.A.'s habitual residence by retaining her in the United States. Accordingly, the Court held the that the custody dispute should be decided by Brazil.

With regards to Respondent's third argument, "[a] court is not bound to order the return of a child if the respondent can show by a preponderance of the evidence that the petitioner consented to the removal of the child." *Diagne v. Demartino*, No. 2:18-CV-11793, 2018 WL 4385659, at *8 (E.D. Mich. Sept. 14, 2018) (citing Hague Convention on the Civil Aspects of International Child Abduction, Article 13(a). The affirmative defense of consent is concerned with a petitioner's actions before the removal or retention of a child from that child's habitual residence. *Diagne*, 2018 WL 4385659 at *8 (citing *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)). The *Friedrich II* court held that consent requires " . . . an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Pliego v. Hayes*, 86 F. Supp. 3d 678, 698 (W.D. Ky. 2015) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996)). Moreover, " . . . it is important to consider what the petitioner actually

contemplated and agreed to in allowing the child to travel outside its home country." *Diagne*, 2018 WL 4385659 at *8 (citing *Baxter*, 423 F.3d at 371).

In his Answer, Respondent in one sentence stated that "Petitioner had consented to relocating to and living in the United States." (ECF No. 8 at Pg ID 102.) In support of this statement, Respondent points to the fact that Petitioner and Respondent " . . . travelled jointly to the United States with all three children, where Petitioner has acknowledged they planned to stay for 'at least one year'[,] . . . petitioner did not object to the children's enrollment in school in the United States, and even signed herself up for English classes." (ECF No. 26 at Pg ID 492-493.)

However, as the Court discussed in its February 2, 2023 Opinion, " . . . a court must consider all the facts and circumstances concerning the couple's intended stay in the country." *Watts*, 935 F.3d at 1145. This is in line with what courts in this circuit have taken into consideration when evaluating whether a petitioner consented to the removal or retention of their child. *See Diagne*, 2018 WL 4385659 at *8 (". . .it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country); *Capalungan v. Lee*, No. 2:18-CV-1276, 2019 WL 1330711, at *6 (S.D. Ohio Mar. 25, 2019) (citing same). In considering all the facts and circumstances concerning the couples' stay in the United States, and thus what Petitioner *actually*

contemplated and agreed to, the Court determined that the parties last shared intent was to return to Brazil in January of 2023. In support, the Court cited to Petitioner's businesses in Brazil, the testimony from her ex-husband, and the properties the parties owned in Brazil. This evidence precluded a finding—by a preponderance of the evidence—that Petitioner consented to a permanent relocation of M.A. to the United States, contrary to what Respondent alleged.

In sum, the Court does not find that Respondent has a high likelihood of success on appeal, and therefore, this factor weighs against granting his motion to stay.

**ii.    Irreparable Injury**

Next, Respondent alleges that returning M.A. to Brazil at this time will cause her harm in three ways: (i) the associated harm with abruptly removing her from the United States where she established a sense of community; (ii) if this Court's order is reversed, the harm associated with shuttling M.A. back and forth between parents and across international borders, especially as it pertains to her educational and social growth; and (iii) the risk of Petitioner not producing the child for return to the United States if this Court's order is reversed. (ECF No. 26 at Pg ID 493.)

Though the Court empathizes with Respondent's first two concerns, this unfortunately, is the nature of these proceedings. Moreover, as explained more

fully in the public interest analysis below, granting a stay on those bases will only encourage losing parties to appeal district court rulings with the hope that stays will be granted. Lastly, Respondent's third concern does not significantly affect the Court's analysis of this factor. "Courts often adjudicate disputes where the practical impact of any decision is not assured. For example, courts issue default judgments against defendants who failed to appear or participate in the proceedings and therefore seem less likely to comply." *Chafin*, 133 S. Ct. at 1025. Brazil is a signatory to the Hague Convention, and Respondent has presented no evidence that it would simply ignore the Sixth Circuit's decision. *See Guardado Orellana v. Cartagena*, No. 3:16-CV-444-CCS, 2017 WL 11152122, at *5 (E.D. Tenn. Dec. 22, 2017). Accordingly, this factor weighs against a stay.

iii. **Substantial Injury to Other Interested Parties**

The two other interested parties in this litigation are the minor child M.A. and Petitioner. Respondent maintains that Petitioner's repeated absences during the course of M.A.'s life void any argument she will suffer substantial injury by this order being stayed. (ECF No. 26 at Pg ID 494.) It is true that Petitioner has been apart from M.A. for long periods of time, the longest being roughly three months while she was in Brazil—from January 24, 2022, until May 2, 2022—while M.A. remained in Mexico with Respondent. (ECF No. 15 at Pg ID 138.) Be that as it may, M.A. is also an interested party in this litigation. If the Court's

order is affirmed after a stay is granted, M.A. will have lost " . . . precious months when she could have been readjusting to life in her country of habitual residence." *Dumitrascu on behalf of A.M.B.D. v. Dumitrascu*, No. 21-CV-01813-PAB, 2021 WL 4861837, at *5 (D. Colo. Oct. 19, 2021) (citing *Chafin*, 133 S. Ct. at 1027). Further, Respondent's argument also fails because despite Petitioner being away from M.A. for periods of time, she testified at the evidentiary hearing that she spoke with M.A. on a daily basis. Respondent did not dispute this. As such, this factor weighs against a stay.

### iv. Public Interest

Finally, Respondent argues that public interest favors a stay of the return order, because maintaining the status quo is in the best interest of the minor child pending the outcome of the appeal. (ECF No. 26 at Pg ID 494-495.) In support of this argument, Respondent maintains that M.A. has "set down roots in Michigan and is comfortable here." (*Id*.) Though the Court acknowledges the rationale behind this argument, it would be contrary to the purpose of the Act to grant a stay order on this basis. "The objects of the present Convention are to secure the *prompt* return of the children wrongfully removed or retained in any Contracting State . . ." Hague Convention on the Civil Aspects of International Child Abduction, Article 1 (emphasis added). In evaluating whether an ICARA case is deemed moot for purposes of appeal once a child is returned, the Supreme Court in *Chafin*

articulated, "[i]f losing parents were effectively guaranteed a stay, it seems likely that more would appeal, a scenario that would undermine the goal of prompt return and the best interests of children who should in fact be returned." 133 S. Ct. at 1027. The same applies here in evaluating whether maintaining the status quo pending appeal leans in favor of granting a stay. As such, this factor weighs against a stay.

## CONCLUSION

In sum, an evaluation of the four relevant factors does not support granting Respondent's motion to stay. Moreover, the Court does not find it necessary at this time to involve the U.S. Marshal Service in effectuating the safe and speedy return of M.A. to Brazil.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Stay is **DENIED.**

**IT IS FURTHER ORDERED** that Respondent shall return M.A. to Brazil within **thirty (30)** days of entry of this Order.

**SO ORDERED.**

s/ Linda V. Parker<br>
LINDA V. PARKER<br>
U.S. DISTRICT JUDGE

Dated: February 21, 2023